*Notice:* This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RYAN JOHN SANDERS, | ) | |
| | ) | Supreme Court No. S-15403 |
| Petitioner, | ) | Court of Appeals No. A-10943 |
| | ) | |
| v. | ) | Superior Court No. 3AN-07-00018 CR |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7058 – October 9, 2015 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael Spaan, Judge.

Appearances: Michael Schwaiger, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner. Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions & Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Respondent.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices, and Matthews, Senior Justice.* [Winfree, Justice, not participating.]

FABE, Chief Justice.
BOLGER, Justice, with whom STOWERS, Justice, joins, dissenting in part.

---

\*      Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## I.    INTRODUCTION

A criminal defendant on trial for two murders sought to admit a recording of a phone call to the police, placed by a young woman who had since died. On the recording, the young woman told a police officer that one of the victims had told her that both victims were conspiring to attack and rob the defendant. In support of his motion to admit the recording, the defendant argued that the recording was critical to his defense, which centered on justified self-defense and heat of passion. The defendant invoked the hearsay exceptions for a declarant's then existing state of mind, an unavailable declarant's statement against penal interest, and the residual exception for unavailable declarants, as well as his constitutional right to present a defense. The superior court denied the motion. The jury, presented with no evidence of the alleged conspiracy to attack and rob the defendant, convicted him of first- and second-degree murder. He appealed, and the court of appeals affirmed his conviction.

We granted the defendant's petition for hearing to decide whether the deceased witness's statement should have been admitted at trial. We conclude that it should have been admitted, and we therefore reverse the defendant's convictions and remand for a new trial.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    The incident

On New Year's Eve 2006, Ryan Sanders shot and killed Travis Moore and Ashlee Richards at his home. Sanders had invited Moore to a gathering at Sanders's apartment after Moore called him several times that evening. Moore arrived in an SUV with Richards, Raven Ketzler, and his girlfriend, Sherrell Porterfield. Moore, who was carrying an unloaded 9mm caliber Beretta pistol, entered Sanders's apartment with

Porterfield and Richards, who was carrying a push knife.[1] The three left a machete in their SUV along with Ketzler, who did not come into Sanders's apartment during the more than thirty minutes the other three were inside. Nine people were present in Sanders's apartment: Sanders; Moore; Richards; Porterfield; Sanders's brother, Joseph; Sanders's one-year-old daughter; Sanders's girlfriend, Melissa; Sanders's girlfriend's brother, Jeremy; and Jeremy's girlfriend, Mary Jane.

According to Sanders's statement to the police, he was talking in his bedroom with his brother and Moore when Moore pulled out his Beretta and hit Sanders's head with it, splitting open the skin above his eyebrow. Sanders fell to the ground between his bed and the wall, reached for a nearby .38 caliber revolver, and shot at Moore four or five times. Two bullets struck Moore. According to Sanders, everyone, including Moore, ran from the shots. Moore collapsed and died outside the apartment alongside the walkway leading to the front door.

Sanders, who claimed he was unsure whether he had hit Moore, grabbed a .40 caliber Glock semi-automatic handgun and ran outside. He saw "a black coat with fur on it running towards [the] SUV" and remembered that Moore had been wearing a "big black jacket" with fur on it. Sanders stated that he pursued and shot at the running person, not noticing Moore's body as he ran past it. The running person was Richards. Sanders shot Richards nine times, and a tenth bullet grazed her hand. Richards was pronounced dead at the hospital.

Sanders claimed that he stopped shooting after Richards fell and that he was five to ten feet away. Forensic evidence and some witness testimony, however, suggested that some shots were fired into Richards after she fell. Sanders also stated that

---

[1] A push knife is a weapon designed to be grasped so the blade sticks out from the front of the fist. *See People v. Owens*, 2d Crim. No. B248606, 2014 WL 3667199, at *1 n.3 (Cal. App. July 24, 2014).

he did not realize that he had been shooting at someone other than Moore until after it was over, when he approached Richards and saw her hair and then saw Moore's body for the first time while returning to the apartment. Richards was an overweight Caucasian woman with hair past her shoulders. Moore was a fit African-American man with short-cropped hair.

Back in his apartment, Sanders put down his Glock and waited. Before the police arrived Sanders asked his girlfriend's brother, Jeremy, to get the .38 out of the apartment. Jeremy hid the .38 in a parking lot underneath a car, where the police later found it.

The first police officer arriving on scene had to swerve to miss the SUV in which Moore arrived and which was pulling out of the driveway. After stopping for a moment when it almost hit the first officer's car, the SUV continued to try to leave. The second officer to arrive blocked the street, stopping the SUV from leaving.

Sanders, holding a "really bloody" towel to his head, told the first officer that he had been hit in the head with a pistol and then shot two people and that his Glock was inside on the coffee table. While being questioned later at the police station, Sanders denied that any weapons other than a disassembled rifle, Moore's Beretta, and Sanders's Glock had been in the apartment. When the police stated that someone had gotten rid of a gun and they had recovered it, Sanders then admitted that the .38 was involved and that he had asked Jeremy to remove it from the apartment. Sanders said that he did so and lied about it only because he had recently bought the .38 under questionable circumstances. Sanders also stated that he had no idea why Moore attacked him, but that Moore and Joseph, Sanders's brother, had "real problems" because some people, including Joseph, had been at Moore's house and "some money [came] up missing."

## 2.	Carmela Bacod's statement to the police

Two days after the shootings Detective Mark Huelskoetter, the lead detective in the case, received a phone call from Carmela Bacod, which he recorded.[2] The 17-year-old Bacod described a series of events stretching back "about two weeks now," which had started when "Ryan Sanders, he stole money from one of our friends." She explained that Richards had been her best friend since third grade, that she had known Moore "for a couple months," and that she had met Ketzler once. She stated that she had never met Sanders. Bacod reported that she "was supposed to go with them to their house . . . that night," and correctly stated that Ketzler and Porterfield, both of whom she physically described, had been present along with Moore and Richards.

Bacod described a phone call with Richards "about a week and a half ago," in which Richards told Bacod that Richards, Moore, Ketzler, and Porterfield had been hanging out with Sanders one night when they all fell asleep and woke up to discover Sanders gone, along with money that had belonged to Ketzler. Bacod told Detective Huelskoetter that "they wanted to go beat him up to get the money back," and that "Ashlee [Richards] just told me that they wanted the money back, and then they were gonna jump 'em for it." Bacod also told Detective Huelskoetter that Richards "told me that earlier they tried before or something like that, and Ryan's brother got mad or something and pulled a gun on [Raven Ketzler's] face, or something like that." And she answered affirmatively when Detective Huelskoetter asked her, "[Y]ou know that Travis [Moore] wanted to beat Ryan [Sanders] up over the money?" and "[W]hen they were goin' over there that was pretty much the idea, is that Travis [Moore] was gonna beat [Sanders] up?"

---

[2]	A transcript of the call follows this opinion as an appendix.

Later in the call, Bacod was more circumspect. When Detective Huelskoetter asked her if she "knew that kinda the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and — and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back," Bacod stated, "Not — not jump, like, you know, like, talk." She then stated, "But obviously they're young, so, you know, there's gonna be violence in it. But I couldn't stop them."[3]

Bacod gave Detective Huelskoetter her name, date of birth, phone number, and address. She took his name and direct phone number, which she recorded with a pen she requested from her mother, and told him she would call if she thought of anything else.

Sanders was not informed of Bacod's call to Detective Huelskoetter until March 2008, more than a year later. Before trial and less than three months after Sanders had learned of her call, Bacod was killed in a car accident.

## B. Proceedings

### 1. Charges

Ten days after the shootings Sanders was indicted on five counts: first-degree murder of Moore (Count I), first-degree murder of Richards (Count II), second-degree murder of Moore (Count III), second-degree murder of Richards (Count IV), and tampering with physical evidence (Count V).

### 2. Motion in limine to admit Bacod's statement

In February 2009 Sanders filed a motion in limine to admit Bacod's statement at trial. Sanders argued for admission based upon his due process right to present a defense and Alaska Rules of Evidence 803(3) (the state of mind exception to

---

[3] According to the transcript, Bacod and Detective Huelskoetter were talking over one another during this exchange.

hearsay) and 804(b)(3) (the exception for statements against an unavailable declarant's interest) for Richards's statement to Bacod, and 804(b)(5) (the unavailable declarant residual hearsay exception) for Bacod's statement to Detective Huelskoetter.

The superior court denied Sanders's motion, stating that "Ms. Richards'[s] statements to Ms. Bacod regarding her intention to go to the Defendant's residence with Mr. Moore are not admissible under Rule 803(3) as circumstantial evidence that either Ms. Richards [or] Mr. Moore planned to rob and assault the Defendant." The superior court stated its understanding of the specifics of Richards's statement:

> There is no evidence Ms. Richards actually stated she or Mr. Moore planned to assault and rob the Defendant. In the recorded statement, Ms. Bacod extrapolates the inevitability of violence from Ms. Richards'[s] statements. . . . As earlier noted, Ms. Bacod states that Ms. Richards told them they were going over to the Defendant's residence to talk. Ms. Bacod added that there would likely be violence, but she does not state that Ms. Richards affirmatively stated their intention was to rob or assault the Defendant.

Regarding the applicability of Rule 804(b)(5) to Bacod's statement, the superior court stated that "[t]he trustworthiness of the statement may not be established by corroborating evidence" — citing *Ryan v. State*,[4] which in turn cited the United States Supreme Court case *Idaho v. Wright*[5] — and therefore did not consider any extrinsic corroborating evidence. The superior court stated its understanding of the specifics of Bacod's statement:

> The relationship between Ms. Bacod, the Defendant, and the shooting victims in this case is essentially unknown. It is clear that all four parties were in the same social circle, but the only evidence of their relationships to one another is

---

[4]    899 P.2d 1371, 1375 (Alaska App. 1995).

[5]    497 U.S. 805, 822-24 (1990).

contained in the recording itself. . . . The lack of evidence in this respect does not indicate any motivation for Ms. Bacod to lie in the Defendant's favor, but neither does it explain her motivation for calling the police to speak against her fallen friends.[6]

While it is true Ms. Bacod made her statement to a government agent, Ms. Bacod was not under oath and there were no subsequent interviews where Detective Huelskoetter or any other government agent could cross-examine Ms. Bacod regarding her statements or otherwise test her knowledge and veracity. The Detective merely took Ms. Bacod's statements and indicated he might contact her again. Ms. Bacod gave her statement telephonically and there is no way to tell where she was or who else was in the room when she made the call. The statements simply are not "so trustworthy that adversarial testing would add little to its reliability."[21]

_____

[21] *Ryan*, 899 P.2d at 1375 (quoting *Idaho v. Wright*, 497 U.S. at 821); *see also Vaska v. State*, 135 P.3d 1011, 1020 (Alaska 2006).

### 3. Trial

Trial took place in August 2010. None of the nine adults who were at the house testified. No evidence was presented regarding Richards's push knife or the machete in the SUV.[7] Bacod's statement was not introduced, and no evidence was

_____

[6] We note the conundrum created by the court's statement that the *lack* of extrinsic evidence regarding the relationship between Bacod, Sanders, and others counted against Bacod's statement's admission, given the court's prior conclusion that extrinsic evidence could not be considered when determining the statement's trustworthiness.

[7] On the first day of trial the State moved for a protective order preventing Sanders from mentioning the push knife and machete during voir dire and his opening

(continued...)

presented that Ketzler stayed in the SUV. The superior court instructed the jury regarding five defense theories: justified self-defense, heat of passion, defense of premises, defense of a third person, and reasonable mistake of fact (regarding Richards's identity).

During opening statements and closing arguments, the State maintained that self-defense and defense of others did not apply because Sanders's actions were excessive. The State painted Sanders as a liar who also had others lie for him, and it questioned whether Moore had actually been the first aggressor. The State contended that even if the heat of passion defense initially applied, Sanders had time to cool down while he grabbed the second gun and chased Moore out of the apartment. The State also contended that no justification could defend against the first-degree murder of Richards because it would be an unreasonable mistake of fact to believe that she was Moore or that she was armed.

During opening and closing arguments, counsel for Sanders argued that Sanders had been truthful, stating that he immediately took responsibility for the two deaths, waited quietly for the police, put down the Glock in a safe place, and answered the police officer's questions. Sanders's counsel argued that Sanders quickly told the truth about the .38 and that he had lied at first only because he was worried about that gun's provenance. Counsel for Sanders argued that Sanders committed no crime in killing Moore, who had attacked him without warning in his home, because it was self-defense. His counsel also argued that even if Sanders had not acted in self-defense, he

---

[7](...continued)
statement. The court granted this request because there was no evidence that "the knife" was brandished at Sanders or that he knew of "the knife," and it admonished Sanders's counsel not to mention either weapon in voir dire or his opening argument. The court indicated it would take up the issue later if evidence of either the knife's or machete's relevance developed during the trial.

acted in the heat of passion. Counsel further argued that he had made a reasonable mistake of fact regarding Richards's identity, given the low lighting outside, the similarity of Richards's and Moore's coats, and the fast-paced, frenetic situation.

The jury found Sanders not guilty of first-degree murder of Moore, but guilty of the lesser included second-degree murder of Moore under Count I. The jury also found Sanders guilty of the remaining counts, as charged: first-degree murder of Richards, second-degree murder of Moore under a different theory,[8] second-degree murder of Richards, and tampering with physical evidence. By returning these verdicts, the jury rejected all five defense theories.[9]

### 4. Appeal to the court of appeals

On appeal Sanders argued that the superior court had erred by refusing to allow him to introduce Bacod's statement at trial.[10] The court of appeals concluded that

---

[8] Different second-degree murder theories were used for the lesser-included second-degree murder offenses under Counts I and II and the second-degree murder offenses charged directly in Counts III and IV.

[9] The jury was instructed that justified self-defense was a complete defense to first-degree murder, second-degree murder, and manslaughter. If the jury believed Sanders killed Moore in justified self-defense, it would have found Sanders not guilty of all charges related to Moore's death. Instead, the jury found Sanders guilty of the second-degree murder of Moore under two theories.

The jury also was instructed that heat of passion was a defense to the lesser included second-degree murder theories but not the direct second-degree murder charges. The jury found Sanders guilty of *all* second-degree murder offenses, demonstrating that it did not believe Sanders killed Moore or Richards in the heat of passion.

[10] *See Sanders v. State*, Mem. Op. & J. No. 5991, 2013 WL 6229377, at *1 (Alaska App. Nov. 27, 2013). Sanders also argued that the superior court erred by allowing the State to introduce his girlfriend's and his brother's false statements to the police: Detective Huelskoetter testified that Sanders's girlfriend said that Sanders's

(continued...)

the superior court "did not abuse [its] discretion" by finding Bacod's statement inadmissible, stating:

> Bacod told the police that Richards said to her that they were going to go over to Sanders's residence to confront him. Bacod added that she thought the confrontation was likely to be violent.
>
> . . . .
>
> In the present case, Sanders offered Bacod's out-of-court statements for the purpose of proving that Richards and Moore went to Sanders's house intending to use violence to retrieve money from Sanders or his brother. But even according to Bacod, Richards never said that she or Moore intended to use violence; instead Richards said that they wished to talk to Sanders about the money. In Bacod's statements to the police, she acknowledged that the possibility of violence was only her speculation, or her after-the-fact gloss on her conversation with Richards.[11]

Like the superior court, the court of appeals quoted *Ryan v. State* for the proposition that "evidence admitted under the residual hearsay exceptions must possess 'particularized guarantees of trustworthiness' making it 'so trustworthy that adversarial testing would add little to its reliability.' "[12] The court added, "[T]here was essentially

---

[10](...continued)
brother fired a rifle inside the apartment; he also testified that Sanders's brother said that Moore fired at Sanders first. *Id.* at *1, *5-6. The State labeled both statements "lies" in its closing argument while questioning Sanders's veracity and whether Moore was the first aggressor. The court of appeals concluded that the admission of these statements was error, but was harmless. *See id.* at *1, *7.

[11]     *Id.* at *1, *5.

[12]     *Id.* at *5 (quoting 899 P.2d 1371, 1375 (Alaska App. 1995)).

no evidence regarding Bacod's potential motivation for contacting the police."[13]  The court of appeals upheld the trial judge's ruling.[14]

Regarding Sanders's argument that the exclusion of Bacod's statement violated his due process right to present a defense, the court of appeals stated, "[I]n general, a trial court does not commit error by properly applying the evidence rules."[15] The court of appeals then concluded:  "We have previously pointed out the lack of reliability of Bacod's recorded statement to establish the proposition for which it was offered.  We conclude that the trial court's proper application of the evidence rules did not unfairly limit Sanders's ability to present a defense."[16]

Chief Judge Mannheimer concurred with the court's opinion, writing separately to point out that Sanders wished to introduce Richards's statement to prove Moore's future actions.[17] Chief Judge Mannheimer cited the Commentary to Rule 803(3) (the state of mind hearsay exception) to explain that the Rule "does not allow a litigant to introduce one person's statement about their current mental state (including their current plans) for the purpose of proving *another person's* future actions."[18]  This

---

[13]    *Id.*

[14]    *Id.*

[15]    *Id.*

[16]    *Id.*

[17]    *See id.* at *7-10 (Mannheimer, C.J., concurring).

[18]    *Id.* at *8 (emphasis in original).

provided, in his view, an additional reason that the contested statements were not admissible.[19]

### 5.     Petition for hearing

Sanders filed a petition for hearing with this court, and we granted it, in part, on "whether exclusion of Carmela Bacod's hearsay statement to the investigating detective was reversible error."

Sanders argues that Bacod's statement was admissible under the Rules of Evidence — using both Rule 803(3) (the state of mind hearsay exception) and Rule 804(b)(5) (the unavailable declarant residual hearsay exception) — to show Richards's intent and conduct in going to Sanders's apartment on New Year's Eve. Sanders also argues, based on his constitutional right to present a defense, that Bacod's statement was admissible to show *both* Richards's and Moore's intent and conduct in going to Sanders's apartment. Sanders argues that the failure to admit the statement under these theories was error and that the error was not harmless.

## III.   STANDARD OF REVIEW

A trial court's "[f]actual findings are reviewed for clear error. We will reverse . . . factual findings only when, after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made."[20] When the admissibility of evidence "turns on a question of law, such as the 'correct scope or interpretation of a rule of evidence,' we apply our 'independent judgment . . . .' "[21]

---

[19]     *See id.* at *8-10.

[20]     *Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014) (footnote and internal quotation marks omitted).

[21]     *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350 (Alaska 2012) (quoting *City of Bethel v. Peters*, 97 P.3d 822, 825 (Alaska 2004)). In contrast, when we
(continued...)

Under the de novo standard of review, we adopt the rule of law that is "most persuasive in light of reason, precedent and policy."[22]  We also review constitutional interpretation issues de novo.[23]

## IV. DISCUSSION

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[24]  As a general rule hearsay is not admissible,[25] but the Rules of Evidence contain exceptions[26] and define certain types of out-of-court statements as not hearsay.[27] The proposed evidence in this case contains two levels of hearsay, each of which must be individually admissible for the exclusions Sanders challenges to have been

---

[21](...continued)
review a trial court's decision to admit or exclude evidence solely as an application of a correctly interpreted rule of evidence to the facts of the instant case, we apply the abuse of discretion standard of review.  *See Greene v. Tinker*, 332 P.3d 21, 31, 37-38 (Alaska 2014) (evaluating for abuse of discretion a trial court's decision to admit testimony of late-identified witness).

[22]     *Barton*, 268 P.3d at 350 (internal quotation marks omitted); *see also ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014).

[23]     *See Khan v. State*, 278 P.3d 893, 896 (Alaska 2012).

[24]     Alaska R. Evid. 801(c).

[25]     *See* Alaska R. Evid. 802.

[26]     *See* Alaska R. Evid. 803-04.

[27]     *See* Alaska R. Evid. 801(d).

erroneous.[28]  If either Richards's statement to Bacod or Bacod's statement to Detective Huelskoetter was inadmissible, the proposed evidence was entirely inadmissible.

**A.    Richards's Statement To Bacod Was Admissible As Evidence of Richards's Then Existing State Of Mind Under Alaska Rule Of Evidence 803(3).**

Under Alaska Rule of Evidence 803(3), "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove the declarant's present condition or future action," is not excluded by the hearsay rule. Sanders argues that Richards's statement to Bacod was admissible to show Richards's intent and conduct in going to Sanders's apartment.  We agree.

The superior court found that "[t]here is no evidence Ms. Richards actually stated she or Mr. Moore planned to assault and rob [Sanders]."  Instead, the superior court concluded, "Ms. Bacod extrapolates the inevitability of violence from Ms. Richards's statement."  The court of appeals agreed, stating that "even according to Bacod, Richards never said that she or Moore intended to use violence; instead Richards said that they wished to talk to Sanders about the money."[29]  The court of appeals also concluded that "[i]n Bacod's statements to the police, she acknowledged that the possibility of violence was only her speculation, or her after-the-fact gloss on her conversation with Richards."[30]

We disagree with this interpretation of Bacod's statement.  Bacod's first recorded words to Detective Huelskoetter were, "Everything happened, and *she told me,*

---

[28]    *See* Alaska R. Evid. 805.

[29]    *Sanders v. State*, Mem. Op. & J. No. 5991, 2013 WL 6229377, at *5 (Alaska App. Nov. 27, 2013).

[30]    *Id.*

like, actually it's been goin' on for like, about two weeks now. Um, the — Ryan Sanders, he stole money from one of our friends, and they wanted to go beat him up to get the money back." (Emphasis added.) Bacod later stated, "*Ashlee just told me* that they wanted the money back, and then they were gonna jump 'em for it," and said "[*s*]*he told me* that earlier they tried before or something like that." (Emphasis added.) She also answered in the affirmative when Detective Huelskoetter twice asked her direct questions verifying that Moore was planning to go beat up Sanders:

> Q. So — but you know that Travis [Moore] wanted to beat Ryan [Sanders] up over the money?
>
> A. Yeah.
>
> Q. And that when they were goin' over there that was pretty much the idea, is that Travis [Moore] was gonna beat [Sanders] up?
>
> A. Yeah.

Only after verifying with Detective Huelskoetter that Porterfield and Ketzler, who were both still alive, had been present the night of the shooting did Bacod partially backtrack:

> Q. So, now, just let me see if I understand correctly, that you knew that kinda the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and — and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back?
>
> A. Not - not jump, like, you know, like, talk.
>
> . . . .
>
> A. [T]hey're young, so, you know, there's gonna be violence in it.
>
> . . . .
>
> A. But, I couldn't stop them.

Q.     Right. So, they — they — I mean basically the only reason they were going over there was to get the money back.

A.     Probably.

The State does not forcefully contest that Richards told Bacod about the plan to confront Sanders.  Instead it argues that Richards's statement was not of her *own* intent, but instead the intent of "an unidentified 'they.' "  But the "they" in question is not unidentified.  Bacod named the four people involved, including Richards.  When Detective Huelskoetter summarized what Bacod had told him — "the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and — and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back" — Bacod did not say that Richards was not part of the group making the plan.  The State's argument that only Moore, and not Richards, intended to beat up Sanders fails for similar reasons:  Bacod, in recounting her conversation with Richards, said multiple times that "they" — not just Moore — were going to beat up Sanders.

The State argues that the statements regarding Sanders stealing money are inadmissible hearsay because they are being offered to prove that Sanders stole money.  But Sanders offered the statements about the theft to show Richards's *motive*, not whether Sanders actually stole money.  Richards's belief that the theft was committed by Sanders explained her motive in going to Sanders's apartment.[31]

---

[31]     The State also argues that Richards's statements regarding Sanders's theft of money may not have been based upon her own personal knowledge and thus would be inadmissible under Alaska Rule of Evidence 602, which permits a witness to testify only to matters about which she has personal knowledge.  But the statements were being offered to prove Richards's *belief* that Sanders stole the money as her motive to attack him.  Richards had personal knowledge regarding her own belief, just as she had personal knowledge regarding her own plan to beat up Sanders.

-17-                                                                                              7058

The State also contends the word "jump" as used by Bacod meant "talk," not assault. The State argues that Bacod "expressly defined jump for her purposes." This is contradicted by the statement itself. Before using the word "jump," Bacod stated that the group was planning to "beat [Sanders] up." Bacod twice answered in the affirmative Detective Huelskoetter's direct questions verifying that Moore was planning to go "beat up" Sanders.

Bacod stated that Richards directly expressed her intent to beat up Sanders and her motive for doing so. This statement of Richards's intent and motive was admissible under Rule 803(3) to show her future action.[32] Because we conclude that the superior court's factual finding that Bacod merely extrapolated violence from Richards's statement to her was clearly erroneous, we must reverse the court of appeals' decision upholding the superior court's Rule 803(3) ruling.

**B.     Richards's Statement To Bacod Was Admissible As Evidence of Moore's Future Actions Under Alaska Rule Of Evidence 803(23).**

Although Richards's statement to Bacod was relevant to explain some of Richards's conduct at Sanders's home, its greater potential relevance was to explain Moore's conduct, which, according to Sanders, included pistol-whipping Sanders without provocation. However, as Chief Judge Mannheimer noted in his concurring opinion below, "the Commentary to Evidence Rule 803(3) explains that Rule 803(3)

---

[32]     Sanders's stated purpose in requesting admission of Richards's statement of her own motive and intent includes showing "Richards'[s] conduct at Sanders'[s] home" — that "she would have behaved like Moore would have behaved after Sanders fought him off" and in particular that she chose to flee Sanders's home to get to the "getaway car" (instead of "fighting, hiding, staying in place, or withdrawing") and "did nothing to rescue Sanders from his assailant." Sanders also states that "evidence of Richards'[s] robbery plot would have show[n] that Richards shared Moore's escape route — Porterfield's SUV" and that "Richards ran because she had made the mistake of bringing a knife to attack a man with a gun."

does not allow a litigant to introduce one person's statement about their current mental state (including their current plans) for the purpose of proving *another person's* future actions."[33] Thus, if Richards's statement to Bacod was admissible only to demonstrate *Richards's* future actions, and not Moore's, its probative value might have been outweighed by the danger of unfair prejudice,[34] making it proper for the trial court to exclude it or subject it to a limiting instruction.[35] But the circumstances in this case demonstrate that Richards's statement was admissible not only to prove Richards's intent and conduct, but also Moore's.

The Commentary to Rule 803(3) explains that "[f]or the statements of one person as to his mental or emotional condition to be used against another, [Evidence Rule 803](23) must be satisfied."[36] Rule 803(23) is a residual hearsay exception. It permits the admission of a statement that would otherwise be excluded as hearsay if it has "circumstantial guarantees of trustworthiness" that are "equivalent" to the listed exceptions, and "if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence."

---

[33] *Sanders*, 2013 WL 6229377, at *8 (Mannheimer, C.J., concurring) (emphasis in original).

[34] *See* Alaska R. Evid. 403.

[35] *Cf. Linton v. State*, 880 P.2d 123, 130-31 & n.6 (Alaska App. 1994) (affirming introduction of murder victim's hearsay statements, with limiting instruction, under Rule 803(3) even though the statements concerned the victim's fear of the defendant and the defendant's alleged threats to the victim).

[36] Commentary Alaska E. R. 803(3).

In this case, the party seeking to introduce a statement under the residual exception is a criminal defendant. This fact is important in two interrelated ways. First, Sanders, like all criminal defendants, enjoys a constitutional right to due process of law before he is convicted of a crime.[37] "Although it is not absolute, a defendant's right to present a defense is a fundamental element of due process."[38] Evidentiary rulings can so infringe this right to present a defense that they constitute a violation of the guarantee of our constitution's due process clause,[39] which requires admission even of evidence that the legislature has specifically barred if its exclusion "substantially limits the right to present a defense."[40] Here, however, as we explain below, it is an incorrect application of the evidence rules that encroaches on this right.

Sanders presented five defense theories to the jury: justified self-defense, heat of passion, defense of premises, defense of a third person, and reasonable mistake of fact (regarding Richards's identity). The credibility of each of these theories was tied to the jury's willingness to believe Sanders's account of Moore striking him without provocation, an account that the State argued "doesn't make any sense" during closing argument. The exclusion of Richards's statement to Bacod effectively excluded all evidence of the alleged conspiracy to rob Sanders and thus excluded critical evidence relevant to the credibility of Sanders's account of the events that preceded the shootings. The jury was left with an account in which, as the State put it in closing argument, Sanders "tells us for no reason, no reason whatsoever, no reason that he's willing to admit, Mr. Moore whacks him on the head and causes that gash, that gash above his eye,

---

[37]     *See* Alaska Const. art. I, § 7.

[38]     *Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999) (citation omitted).

[39]     *See id.*

[40]     *Valentine v. State*, 215 P.3d 319, 326 (Alaska 2009).

for no reason whatsoever." The exclusion prevented the jury from hearing the only available evidence of the missing "reason" the State rhetorically lamented.[41]

The second way that Sanders's status as a criminal defendant is important is the fact that the State likely could have used Richards's statement against Moore if it had sought to prosecute Moore for conspiracy to commit robbery.[42] Alaska Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Richards told Bacod about an on-going plan to rob Sanders — a plan that Richards shared with Moore and which they had already attempted to put into action, only to be resisted by Sanders's armed brother. Bacod was apparently supposed to join her four friends when they went to Sanders's house on the night of the shootings. Moore's actions, including going to Sanders's home with the other alleged participants in the conspiracy while carrying a pistol and, according to Sanders's account, striking Sanders in the face, corroborate his connection to the conspiracy Richards described.[43]

Rule 801(d)(2)(E) is not directly applicable to this case because Moore is not a party to the State's prosecution of Sanders and thus Richards is not a party's co-conspirator. But Rule 803(23), which must be satisfied "[f]or the statements of one

---

[41] *Cf. Keith v. State*, 612 P.2d 977, 982-83 (Alaska 1980) ("If the superior court's refusal to admit the journal did, in fact, substantially limit Keith's opportunities to prove his innocence affirmatively, the due process right to a fair trial would have been denied him.").

[42] *See* AS 11.31.120 (conspiracy); 11.41.500 (robbery in the first degree).

[43] *Cf. Stewart v. State*, 756 P.2d 900, 904-05 (Alaska App. 1988) (discussing evidence that corroborated a defendant's connection to a plan described in a co-conspirator's statement).

person as to [her] mental or emotional condition to be used against another,"[44] allows for the admission of statements that have "circumstantial guarantees of trustworthiness" that are "equivalent" to the other exceptions to the bar on hearsay. Statements made by a co-conspirator in furtherance of a conspiracy were traditionally defined as an exception to the hearsay rule, but under the revised Alaska Rules of Evidence they are defined as nonhearsay.[45] Their characterizaion as nonhearsay is largely predicated on expectations of trustworthiness, just like the exceptions listed in Rule 803.[46] Richards's statement establishing Moore's participation in a conspiracy to rob Sanders did not become less trustworthy because Sanders, rather than the State, sought to introduce it.

The "interest of justice" factor identified in Rule 803(23) dovetails in this case with the right to present a defense. In light of this factor, Richards's statement fits within the residual hearsay exception even as it pertains to Moore's future actions. Here the only reasonably available evidence explaining Moore's alleged unprovoked assault on Sanders was his co-conspirator's statement that she, Moore, and others "wanted to go beat [Sanders] up to get the money back." Richards's statement to Bacod was therefore admissible.

---

[44]     Commentary Alaska E. R. 803(3).

[45]     *See Hawley v. State*, 614 P.2d 1349, 1357 n.20 (Alaska 1980); Commentary Alaska E. R. 801(d)(2) ("[I]f these rules [—801(d)(2)(C),(D), and (E)—] were written on a clean slate without reference to the Federal Rules, admissions would be treated as exceptions to the hearsay rule and placed under Rule 803.").

[46]     *See* MODEL CODE OF EVIDENCE, Rule 508 cmt. b (1942) ("[T]he tendency in the authorities is to receive evidence of all declarations of a conspirator concerning the conspiracy when made during its pendency. These statements are likely to be true, and are usually made with a realization that they are against the declarant's interest.").

**C.      Bacod's Statement To Detective Huelskoetter Was Admissible As Evidence Of Richards's Statement Under Alaska Rule Of Evidence 804(b)(5).**

**1.      The superior court and court of appeals excluded Bacod's statement to Detective Huelskoetter based on an overly demanding test for determining sufficient trustworthiness under the unavailable declarant residual hearsay exception.**

Alaska Rule of Evidence 804(b)(5) is, like Rule 803(23), a residual hearsay exception.  It permits the admission of a statement by an unavailable declarant that would otherwise be excluded as hearsay if it has "circumstantial guarantees of trustworthiness" that are "equivalent" to the listed exceptions, and "if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."[47]

The superior court stated that Bacod's statement did not fall within Rule 804(b)(5)'s residual exception because it was not "so trustworthy that adversarial testing would add little to its reliability."  The court of appeals agreed, and quoted the same language in support of its conclusion that the superior court did not abuse its discretion in excluding Bacod's statement.[48]  The quoted standard is from the court of

---

[47]      Alaska R. Evid. 804(b)(5).

[48]      *See Sanders v. State*, Mem. Op. & J. No. 5991, 2013 WL 6229377, at *5 (Alaska App. Nov. 27, 2013).

appeals's decision in *Ryan v. State*,[49] which in turn was quoting the United States Supreme Court's decision in *Idaho v. Wright*.[50]

Both *Wright* and *Ryan* are Confrontation Clause cases.[51] They were decided based on the precedent established in *Ohio v. Roberts*, under which even testimonial hearsay could be admissible against a criminal defendant as long as it fell "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."[52] Both cases considered "residual" hearsay evidence offered by the government against a criminal defendant protected by the Confrontation Clause, and both erected a demanding standard for admission: The courts would only allow a criminal defendant to be tried based on the word of a declarant he could not confront if the statement was "so trustworthy that adversarial testing would add little to its reliability."[53]

---

[49]    899 P.2d 1371, 1375 (Alaska App. 1995).

[50]    497 U.S. 805, 821 (1990).

[51]    *See id.* at 808 ("This case requires us to decide whether the admission at trial of certain hearsay statements made by a child declarant to an examining pediatrician violates a defendant's rights under the Confrontation Clause of the Sixth Amendment."); *Ryan*, 899 P.2d at 1375 ("Because the hearsay issue in this case arises in the context of a criminal prosecution, the hearsay must satisfy not only the requirements of Evidence Rule 804(b) but also the requirements of the Confrontation Clauses of the Federal and Alaska Constitutions (the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Alaska Constitution).").

[52]    448 U.S. 56, 66 (1980).

[53]    *Wright*, 497 U.S. at 821; *see also Ryan*, 899 P.2d at 1375. The United States Supreme Court disapproved the *Ohio v. Roberts* approach in *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006), which established that "hearsay evidence may violate a defendant's right of confrontation even though that evidence might be admissible under the hearsay rules." *Clark v. State*, 199 P.3d 1203, 1210 (Alaska App. 2009). By decoupling the Confrontation Clause and the

(continued...)

-24-                                                    **7058**

In contrast, in this case it was Sanders, rather than the State, who sought to admit Bacod's statement. The State is, of course, not protected by the Confrontation Clauses in the Alaska and United States Constitutions. And the State has not identified any case in which the test the superior court used has been applied to evidence introduced by a criminal defendant. The superior court thus erred by applying the heightened reliability standard that limited the residual hearsay exception in Rule 804(b)(5) to evidence "so trustworthy that adversarial testing would add little to its reliability" to Bacod's statement. Instead, the superior court should have applied the test set out in Evidence Rule 804(b)(5) itself: A statement by an unavailable declarant is admissible if (1) "the statement is offered as evidence of a material fact," (2) "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," (3) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence," and (4) the statement has "circumstantial guarantees of trustworthiness" that are "equivalent" to the guarantees of trustworthiness that justify the enumerated hearsay exceptions when a declarant is unavailable.

Importantly, the enumerated exceptions to which Rule 804(b)(5) refers are those that apply only when the declarant is unavailable. "The traditional exceptions to the hearsay rule form two general classes: (1) those statements which are *so inherently reliable* that cross-examination is thought unnecessary (Rule 803); and (2) those statements which are *sufficiently reliable* to be admitted in light of their great evidentiary

---

[53](...continued)
rules of evidence, *Crawford* and *Davis* removed the need to erect a demanding residual hearsay standard to serve the purposes of the Confrontation Clause. *Cf. Whorton v. Bockting*, 549 U.S. 406, 413-14 (2007) ("*Roberts* potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause.").

value when the declarant is unavailable (Rule 804)."[54] The exceptions to which 804(b)(5) refers all have circumstantial guarantees of trustworthiness, such as the unavailable declarant's belief of her impending death[55] or admission to civil or criminal liability,[56] but they are not necessarily "so trustworthy that adversarial testing would add little to [their] reliability." In fact, the limitation of these exceptions to circumstances in which the declarant is unavailable suggests that cross-examination *would* add to their reliability, and would be required if it were possible.[57] Thus, the superior court's application of the demanding "adversarial testing would add little" standard to Sanders's efforts to admit Bacod's statement under Rule 804(b)(5) was a legal error.

2. **It was legal error for the superior court to refuse to consider evidence that corroborated Bacod's statement to Detective Huelskoetter.**

The superior court ruled that "[t]he trustworthiness of [Bacod's] statement [to Detective Huelskoetter] may not be established by corroborating evidence." The

---

[54] *In re A.S.W.*, 834 P.2d 801, 804 (Alaska 1992) (emphasis added).

[55] *See* Alaska R. Evid. 804(b)(2).

[56] *See* Alaska R. Evid. 804(b)(3).

[57] *See* Commentary Alaska E. R. 804(b) ("Rule 803 . . . is based upon the assumption that a hearsay statement falling within one of its exceptions possesses qualities which justify the conclusion that whether the declarant is available or unavailable is not a relevant factor in determining admissibility. [Rule 804(b)] proceeds upon a different theory: hearsay which admittedly is not equal in quality to testimony of the declarant on the stand may nevertheless be admitted if the declarant is unavailable and if his statement meets a specified standard. The rule expresses preferences: testimony given on the stand in person is preferred over hearsay, and hearsay, if of the specified quality, is preferred over complete loss of the evidence of the declarant.").

court of appeals did not specifically consider this claim of error.[58] The superior court's ruling on this point is legal error and is inconsistent with our cases interpreting Evidence Rule 804(b)(5).

The superior court cited *Ryan v. State* in support of its no-corroborating-evidence rule. As discussed above, *Ryan* was a Confrontation Clause case. Like the heightened reliability requirement for unavailable declarant hearsay testimony, the requirement that "[t]he required 'guarantees of trustworthiness' may not be established by showing that the hearsay statement is corroborated by other evidence" was based on the court of appeals' interpretation of *Idaho v. Wright*.[59] The court of appeals in *Ryan* limited this holding to cases implicating the Confrontation Clause.[60] The application of the prohibition on corroborating evidence to a criminal defendant's attempt to introduce hearsay evidence is error,[61] particularly in light of a criminal defendant's constitutional

---

[58]    *See generally Sanders v. State*, Mem. Op. & J. No. 5991, 2013 WL 6229377 (Alaska App. Nov. 27, 2013).

[59]    *See Ryan v. State*, 899 P.2d 1371, 1375 (Alaska App. 1995) (citing *Idaho v. Wright*, 497 U.S. 805, 822-24 (1990)).

[60]    *See id.* ("In *Idaho v. Wright*, the United States Supreme Court held that, at least for Confrontation Clause purposes, a hearsay statement's 'guarantees of trustworthiness' must be 'inherent' in the statement." (quoting *Wright*, 497 U.S. at 822)).

[61]    *See Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013) ("[*Wright*'s] requirement that the truthfulness of a statement be so clear [from only the circumstances surrounding the statement] that the test of cross-examination be of marginal utility is specific to the Confrontation Clause; thus, the requirement is inapplicable in this [civil] case."); *United States v. NB*, 59 F.3d 771, 776 n.5 (8th Cir. 1995) ("*Wright* has no effect on hearsay analysis when there is no Confrontation Clause issue."); 5 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:141, at 286-88 (4th ed. 2013) ("Obviously *Wright* does not affect use of the catchall [hearsay exception] in civil cases, nor limit defense use of the catchall in criminal cases,

(continued...)

right to present a defense.

In cases that do not feature the specific protections of the Confrontation Clause, extrinsic corroborating evidence often supports the admission of evidence offered under the residual hearsay exceptions in Evidence Rules 804(b)(5) and 803(23).[62] Permitting trial courts to consider extrinsic corroboration appears to be the majority rule in jurisdictions which have specifically addressed the issue.[63] This

---

[61](...continued) and in these settings independent corroboration continues to count in assessing trustworthiness.").

[62] *See, e.g.*, *Kristen L. v. Benjamin W.*, Mem. Op. & J. No. 1502, 2014 WL 2716842, at *3 (Alaska June 11, 2014) (corroborating notes supported admission of counselor's testimony about children's statements under the catchall hearsay exception); *In re T.P.*, 838 P.2d 1236, 1241-42 (Alaska 1992) (approving of trial court's admission of minor's hearsay statement under Evidence Rule 804(b)(5) partially because a reference in the statement to the location of an alleged sexual touching was corroborated); *cf. Matanuska Elec. Ass'n v. Weissler*, 723 P.2d 600, 610 n.17 (Alaska 1986) (approving of trial court's ruling that the fact that a hearsay "statement also corroborates other testimony" makes it more appropriate to admit under Evidence Rules 804(b)(5) and 803(23)).

[63] *See United States v. Turner*, 718 F.3d 226, 233-34 (3d Cir. 2013) ("[When determining] whether a document is sufficiently trustworthy to be admitted under [the residual hearsay exception] . . . , the district court may not rely *exclusively* on corroborating evidence." (emphasis added) (citation omitted)); *United States v. Redlightning*, 624 F.3d 1090, 1118 (9th Cir. 2010) (concluding that a hearsay statement lacked "circumstantial guarantees of trustworthiness" under residual hearsay exception in part because it was uncorroborated and in part because extrinsic evidence contradicted it); *United States v. Hunt*, 521 F.3d 636, 643-44 (6th Cir. 2008) (finding hearsay statements lacked "circumstantial guarantees of trustworthiness" because they were uncorroborated); *United States v. Abreu*, 342 F.3d 183, 191 (2d Cir. 2003) (finding hearsay statements lacked "circumstantial guarantees of trustworthiness" in part because they were "uncorroborated"); *United States v. Hall*, 165 F.3d 1095, 1110-11 (7th Cir. 1999) (stating relevant factor when determining "circumstantial guarantees of

(continued...)

**63**(...continued)

trustworthiness" is "whether the declarant's statement was insufficiently corroborated"); *United States v. Panzardi-Lespier*, 918 F.2d 313, 316-17 (1st Cir. 1990) (listing corroboration as one factor in determining "circumstantial guarantees of trustworthiness" and using extrinsic corroboration, after *Wright*); *State v. Allen*, 755 P.2d 1153, 1164 (Ariz. 1988) ("We do not require corroboration under the residual hearsay exceptions, but its existence is nevertheless helpful."); *Martin v. State*, 57 S.W.3d 136, 142 (Ark. 2001) (concluding in the context of determining "circumstantial guarantees of trustworthiness," that details from the accomplice's post-crime hearsay statements, including "the detailed directions to the abandoned house, the fact that [the victim's] face and mouth had been duct-taped, and the fact that her arms and legs were hogtied[, ]were highly indicative of the truthfulness of [the] statements . . . ."); *Cabrera v. State*, 840 A.2d 1256, 1268 (Del. 2004) ("[The] statements fail to satisfy the . . . circumstantial guarantees of trustworthiness [requirement under the residual hearsay exception] for the same reasons that they were not admissible under [the statement against penal interest exception] — they were not supported by sufficient corroborating evidence."); *State v. Weaver*, 554 N.W.2d 240, 248 (Iowa 1996), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998) ("Factors to consider in making a trustworthiness determination under [the residual hearsay exception] include: . . . corroboration . . . ."); *People v. Katt*, 662 N.W.2d 12, 24 n.12 (Mich. 2003) ("[C]orroborative evidence may be used to determine the trustworthiness of statements [offered under the residual hearsay exceptions] . . . [if] the Confrontation Clause is not implicated." (emphasis omitted) (citations omitted)); *State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013) (listing corroborating evidence as a relevant factor for determining "circumstantial guarantees of trustworthiness" under a residual hearsay exception); *State v. Cottier*, 755 N.W.2d 120, 131 (S.D. 2008) ("[F]actors for a trial court to consider in assessing trustworthiness of hearsay offered under the residual hearsay rule . . . include: . . . the existence of corroborating evidence . . . ."); *State v. Lopez*, 843 N.W.2d 390, 437 (Wis. 2014) (stating that factors to consider in determining "circumstantial guarantees of trustworthiness" under a residual hearsay exception include "the existence of other corroborating evidence"); *Lafond v. State*, 89 P.3d 324, 339 (Wyo. 2004) ("[C]ircumstantial guarantees of trustworthiness . . . may be established . . . through other corroborating evidence . . . ." (quoting *Johnson v. State*, 930 P.2d 358, 366 (Wyo. 1996))); 2 GEORGE E. DIX ET AL., MCCORMICK ON EVIDENCE § 324, at 565-66 (Kenneth S. Broun ed., 7th ed. 2013) ("[E]ven before *Crawford v. Washington* eliminated the precedential value of *Wright*, some lower courts used corroboration as a factor establishing trustworthiness of hearsay

(continued...)

interpretation makes sense, as a court testing a statement's admissibility under the residual hearsay exceptions is concerned with the trustworthiness of the specific statement at issue, rather than the category of statements to which the statement belongs. There is no logical reason that extrinsic corroborating evidence cannot contribute to creating "circumstantial guarantees of trustworthiness."[64] Indeed, one of the unavailable

---

[63](...continued)
admitted under a catchall exception when the confrontation issue was otherwise eliminated."); 5 FEDERAL EVIDENCE, *supra* note 61, § 8:141, at 286-88; HEARSAY HANDBOOK §§ 47:1-2 (4th ed. 2014); 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 807.03[2][b], at 807-15 to -18 (Joseph M. McLaughlin ed., 2d ed. 2014).

     *But see United States v. El-Mezain*, 664 F.3d 467, 498 (5th Cir. 2011) ("The determination of trustworthiness is 'drawn from the totality of the circumstances surrounding the making of the statement, but it cannot stem from other corroborating evidence.' [*United States v.*] *Ismoila*, 100 F.3d [380,] 393 [(5th Cir. 1996)] (citing *Idaho v. Wright*, 497 U.S. 805, 820-22 (1990)).");  *Vasquez v. People*, 173 P.3d 1099, 1106-07 (Colo. 2007) (relying upon *Wright* to conclude that extrinsic corroboration is not appropriate consideration when determining "circumstantial guarantees of trustworthiness" under residual hearsay exception); *State v. Aaron L.*, 865 A.2d 1135, 1144 n.20 (Conn. 2005) ("Only factors related to the *circumstances surrounding the making of the challenged statement* may be considered to support the reliability of the hearsay statement at issue." (emphasis in original)); *Larchick v. Diocese of Great Falls-Billings*, 208 P.3d 836, 845 (Mont. 2009) ("[The residual hearsay exception] looks to the circumstances surrounding a hearsay statement when it is made — the circumstantial guarantees of trustworthiness that lend reliability to the hearsay statement in lieu of cross-examination." (internal quotation mark omitted)); *State v. Johnson*, 557 S.E.2d 811, 817 (W. Va. 2001) ("Reliability must be shown from the circumstances surrounding the making of the statement.").

     [64]    The State argues that the word "circumstantial" in "equivalent circumstantial guarantees of trustworthiness" means only the *immediate* circumstances of the statement, not any extrinsic corroborating circumstances. But the word "circumstantial" could just as easily include *any* circumstances indicating trustworthiness, including extrinsic corroboration. The wording of Rule 804(b)(5) does

(continued...)

declarant hearsay exceptions to which evidence offered under the residual hearsay exception is compared contemplates the use of extrinsic evidence to support the hearsay statement,[65] and another, in some circumstances, requires it.[66] We therefore agree with the majority of jurisdictions that extrinsic corroborating evidence may properly be considered in determining whether a statement proffered under Rule 804(b)(5)'s residual hearsay exception exhibits "circumstantial guarantees of trustworthiness" equivalent to the other unavailable declarant hearsay exceptions.

---

[64](...continued)
not exclude the consideration of extrinsic evidence, and we will not read such a prohibition into the rule. *See State v. Robinson*, 718 N.W.2d 400, 409 n.4 (Minn. 2006) ("Nor does the residual exception itself prevent us from considering corroborating evidence. The rule contains no specific limitation . . . .").

The State additionally argues that the presence of extrinsic corroboration precludes the statement from being "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Though it is possible that extrinsic corroborating evidence could be more probative than the hearsay statement it supports, this will not always be the case.

[65]      *See* Alaska R. Evid. 804(b)(4)(B) (exception for statement of personal or family history about a person other than the unavailable declarant "if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared").

[66]      *See* Alaska R. Evid. 804(b)(3) (Although statements against interest are generally admissible, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."). The State argues that Rule 804(b)(3)'s explicit inclusion of corroborating evidence means that the drafters of the rules intended to *disallow* the use of corroborating evidence for the other hearsay exceptions, including Rule 804(b)(5). But the requirement of corroboration in one area does not necessarily entail its prohibition in another. The drafters of Rule 804(b)(5) could have stated that no extrinsic corroboration could be used to find "equivalent circumstantial guarantees of trustworthiness," but they did not.

**3. In light of the correct test of admissibility and the proffered corroborating evidence, Bacod's statement to Detective Huelskoetter should have been admitted.**

As discussed above, a statement by an unavailable declarant is admissible if (1) "the statement is offered as evidence of a material fact," (2) "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," (3) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence," and (4) the statement has "circumstantial guarantees of trustworthiness" that are "equivalent" to the guarantees of trustworthiness that justify the enumerated hearsay exceptions when a declarant is unavailable.[67]   The State contests two of these requirements:  the circumstantial guarantees of Bacod's statement's trustworthiness and whether the statement is more probative on the point for which it was offered than other evidence Sanders could have reasonably procured.

**a. Bacod's statement to Detective Huelskoetter had the required circumstantial guarantees of trustworthiness.**

Whether a particular hearsay statement offered under the residual hearsay exception at Rule 804(b)(5) has sufficient circumstantial guarantees of trustworthiness is necessarily a case-by-case question.  Many courts focus upon idiosyncratic aspects of the particular proffered statement which suggest trustworthiness.[68]   Particularly significant relevant factors relied on by multiple jurisdictions include:

> whether the declarant had a motivation to speak truthfully or otherwise; the spontaneity of the statement, including whether it was elicited by leading questions, and generally

---

[67]   Alaska R. Evid. 804(b)(5).  The Rule also requires adequate notice to the opposing party, a requirement not at issue in this case.

[68]   *See* MCCORMICK ON EVIDENCE, *supra* note 63, § 324, at 561-66.

the time lapse between event and statement; whether the statement was under oath; whether the declarant was subject to cross-examination at the time the statement was made; the relationship between the declarant and the person to whom the statement was made; whether the declarant has recanted or reaffirmed the statement; whether the statement was recorded and particularly whether it was videotaped; and whether the declarant's firsthand knowledge is clearly demonstrated.[69]

And, as discussed above, in cases that do not implicate the Confrontation Clause it is appropriate to consider extrinsic corroborating evidence.

The State correctly notes that the residual hearsay exceptions apply "only on rare occasions,"[70] and are not invitations to discard the general prohibition on the admission of hearsay. But in this case at least five factors — Bacod's motivation to speak truthfully, the spontaneity of her statement, the professional relationship between her and Detective Huelskoetter, the fact that her statement was recorded, and the clear demonstration of her firsthand knowledge of Richards's plan — argue in favor of the statement's trustworthiness, as does the extrinsic corroborating evidence. The particular guarantees of trustworthiness attached to Bacod's statement to Detective Huelskoetter convince us that, given the importance of the statement to Sanders's defense, the statement should have been admitted.[71]

---

[69]     *Id.*

[70]     *In re A.S.W.*, 834 P.2d 801, 804 (Alaska 1992).

[71]     *See id.* (explaining that the unavailable declarant hearsay exceptions in Rule 804 relate to "statements which are sufficiently reliable to be admitted in light of their great evidentiary value"); *see also Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999) (recognizing that exclusion of evidence proffered by a criminal defendant can violate the defendant's due process rights).

### i.    Motivation to speak truthfully

Bacod's statement provides no reason to believe she was speaking insincerely in an effort to help Sanders. She told Detective Huelskoetter that she had known Richards, whom she described as her "best friend," since the third grade, and that she had known Moore for months. She connected her social life to theirs, telling Detective Huelskoetter that she was supposed to have been with Richards, Moore, Ketzler, and Porterfield on the night of the shooting. In contrast, she explained that she had never met Sanders. Despite this asymmetry of bonds, she relayed information that, whether she knew it or not, would have been helpful to Sanders's defense and implicated her friends in a conspiracy to commit robbery. The fact that Sanders did not learn of the call until the State disclosed its existence fifteen months after Bacod placed it further diminishes the chances that Bacod was somehow lying for Sanders's benefit.

### ii.    Spontaneity

It is also relevant that Bacod initiated the call to Detective Huelskoetter. The fact that she sought Detective Huelskoetter out rather than vice versa diminishes the chances that she was telling him what she thought he wanted to hear. Bacod answered Detective Huelskoetter's open-ended questions and stated that she told him everything she knew about the events. She invited him to call her back if he had any further questions, in the process giving him her full name, home address, and phone number. And she apparently did all of this in the presence of her mother.

The dissent complains that "the most relevant portion" of Bacod's statement "was obtained through the detective's leading questions."[72] But only *after* Bacod

---

[72]    Dissent at 44.

reported what she had learned about the plan from her conversation with Richards[73] did Detective Huelskoetter ask the two follow-up questions cited by the dissent. Both questions were posed immediately after Bacod stated, "I can't think right now," and they are therefore best interpreted not as leading questions but as attempts to elicit clarification of Bacod's previous statements.

### iii. Under oath

Bacod's statement to Detective Huelskoetter was not under oath. But because Bacod was speaking with a peace officer about a crime, knowingly providing false information in this call could have possibly subjected Bacod to criminal liability.[74] This possibility, much like an oath, provided a strong incentive to be truthful.

### iv. Cross-examination

Bacod was not subject to cross-examination when she made the statement. Although Detective Huelskoetter asked some clarifying questions, this was no substitute for cross-examination. This factor does not weigh in favor of her statement's admissibility.

---

[73]    "[Sanders] stole money from one of our friends, and they wanted to go beat him up to get the money back . . . ." Bacod then stated, "Ashlee [Richards], . . . Raven [Ketzler], . . . Travis [Moore], and Travis's fiancée Sherrell [Porterfield]. . . woke up with money gone, and they were guessing it was [Sanders] . . . ."

[74]    *See* AS 11.56.800(a)(1)(A) ("A person commits the crime of false information or report if the person knowingly gives false information to a peace officer with the intent of implicating another in an offense."). The State argues that Bacod could not have faced charges for false information or report because "it was Richards who supposedly suggested that others intended to commit a crime," while "Bacod was merely a conduit for that information." But this section applies as readily to "conduits" as to primary souces, so long as the requisite knowledge and intent are present.

#### v. Relationship

The fact that Detective Huelskoetter was the police officer charged with investigating the recent shooting deaths of two of her friends strongly favors Bacod's statement's admissibility. Bacod provided the detective background information about what she believed "triggered it to happen." These serious circumstances invited careful and somber reflection and explanations. Indeed, as discussed above, knowingly lying to Detective Huelskoetter could have subjected Bacod to criminal liability.

#### vi. Recantation and reaffirmation

The record does not contain any evidence that Bacod ever recanted or reaffirmed her statement to Detective Huelskoetter. The dissent charges that Bacod "changed her account in real time in response to what she learned" in the interview with Detective Huelskoetter.[75] But Bacod initially indicated, without any prompting from the detective, that Moore, Richards, Ketzler, and Porterfield wanted to "beat . . . up" Sanders. And while Bacod later added that the four of them were going to "try to talk . . . it out," the dissent omits Bacod's very next statement to the detective: "But . . . obviously. . . they're young, so . . . there's gonna be violence in it." And for most of the time between Bacod's statement and her death Sanders was not aware that she had called and spoken with Detective Huelskoetter.

#### vii. Recording

Detective Huelskoetter recorded Bacod's statement when she called him. If the only record of the statement was Detective Huelskoetter's recollection and testimony there would be risks that he misunderstood or misremembered the conversation. The fact that the jury could have heard the statement eliminates those

---

[75]     Dissent at 43.

risks, although it does not eliminate the risks of Bacod's faulty perception or memory of her conversation with Richards.

###### viii. Clear demonstration of firsthand knowledge

Bacod's statement to Detective Huelskoetter demonstrated her firsthand knowledge of the plan and conflict Richards described. Bacod listed the number of her friends that went to Sanders's house and provided their names. She identified the relationships among them. Her close ties with Richards, whom Bacod described as her "best friend," and whom Bacod was supposed to join on the night of the shooting, provides further reassurance that Bacod had firsthand knowledge of the conversation with Richards.

###### ix. Corroboration

Extrinsic corroborating evidence provides further circumstantial guarantees of trustworthiness in this case. Bacod correctly identified the group of four people that went to Sanders's home together on the night of the shootings without assistance from Detective Huelskoetter. Bacod stated that "they wanted to go beat [Sanders] up to get the money back," and that because the four were young "there's gonna be violence in it." On the night of the shooting, little more than a week after Bacod reported she spoke with Richards, those four people traveled to Sanders's house with a pistol, a push knife, and a machete. According to Sanders, one of them struck him with the pistol without warning, an action consistent with the plan to "jump" Sanders that Bacod described.

Taken together, the "idiosyncratic factors"[76] surrounding Bacod's statement to Detective Huelskoetter convince us that it had the circumstantial guarantees of trustworthiness that Evidence Rule 804(b)(5) requires. Bacod's statement was essential to the defense theories Sanders had a constitutional right to present, and it, like the rest

---

[76] MCCORMICK ON EVIDENCE, *supra* note 63, § 324, at 561.

of the Rule 804 exceptions for unavailable declarants, was "sufficiently reliable to be admitted in light of [its] great evidentiary value."[77]

> **b.** **Bacod's statement to Detective Huelskoetter was more probative on the point for which it was offered than other evidence Sanders could have reasonably procured.**

The State also argues that Bacod's statement to Detective Huelskoetter was inadmissible because Porterfield and Ketzler were available to testify, "and both would have presumably known about the purported plan." It follows, the State argues, that the statement Sanders sought to introduce was not "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," as Rule 804(b)(5) requires.[78]

Although it is difficult to precisely define the scope of "the point for which [evidence] is offered," it is clear that Bacod was in a unique position in this case. She had allegedly learned about an ongoing conspiracy from a close friend, but she did not join in the enterprise. This gave her crucial insight into the aims of the acting parties without exposing her to the threat of criminal liability that would normally silence a participant in a criminal scheme. The record contains no hint of another witness prepared to testify that Richards and Moore planned to "jump" Sanders or of any other person who was aware of the plan but not participating in it. The State acknowledges in its brief that Porterfield, one of the witnesses it faults Sanders for not interviewing, denied knowledge of any plan to rob and beat up Sanders. And the fourth alleged confederate, Ketzler, similarly denied any role in, or knowledge of, a plan to rob Sanders

---

[77] *In re A.S.W.*, 834 P.2d 801, 804 (Alaska 1992).

[78] The State also alludes to the availability of Sanders's brother, Joseph, to testify that Moore attacked Sanders first, but Bacod's statement was probative of more than just Moore's physical actions in Sanders's bedroom and came from a source much less likely to fabricate testimony on Sanders's behalf.

when questioned by police. Moreover, Bacod learned about the plan from Richards, one of the victims and one of the three people whose states of mind, intentions, and actions were central to the case.

Under these circumstances, and again informed by Sanders's constitutional right to present a defense, we do not believe that Sanders could have reasonably procured any evidence more probative on the points for which Sanders offered Bacod's statement to Detective Huelskoetter. We therefore reject the State's argument that Bacod's statement was inadmissible for this reason and, in conjunction with our determination above that the statement had the required circumstantial guarantees of trustworthiness, and the State's well-reasoned concession that admission of the statement would serve the interests of justice, hold that it should have been admitted under Evidence Rule 804(b)(5).[79]

D.     The Exclusion Of The Two Statements Was Not Harmless.

Although the superior court's exclusion of Richards's statement to Bacod and Bacod's statement to Detective Huelskoetter was erroneous, it is not a basis for reversing Sanders's conviction if the error was harmless.[80] The trial record in this case

---

[79]     In its respondent's brief, the State clarified that "[t]he state does not dispute the potential materiality of the report by Bacod — it refers to the purported statements by Richards, which if admissible, would be relevant. Nor does the state dispute that admission of Bacod's report would be consistent with the evidence rules and the interests of justice. The state, however, disputes that Bacod's report is more probative than other reasonably available evidence."

[80]     *See* Alaska R. Crim. P. 47(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

indicates that the exclusion was not harmless because we cannot "fairly say that the error did not appreciably affect the jury's verdict."[81]

The State argues that the evidence that Richards and Moore had conspired to attack and rob Sanders would not have appreciably affected the jury's verdict because the focus of the State's case was on the excessiveness of Sanders's response, not whether Sanders or Moore was the initial aggressor. The State focuses particularly on the prosecutor's rebuttal argument, during which he appeared to implicitly concede that Moore struck Sanders first. But the strength of the prosecutor's concession was significantly undercut by its context. Just before those statements, the prosecutor noted that he was arguing based on "words from [Sanders's] mouth," but he did not tell the jury to accept them as true. Indeed, much of the prosecutor's first closing argument provided the jury with reason not to credit Sanders's account, including Sanders's explanation of what had provoked the shootings. The prosecutor was hardly conceding that Sanders was credible when he told the jury that Sanders "tells us for no reason, no reason whatsoever, no reason that he's willing to admit, Mr. Moore whacks him on the head and causes that gash, that gash above his eye, for no reason whatsoever." The prosecutor rhetorically asked the jury, "[W]ould it make any sense for Mr. Moore to whack somebody in the head with an unloaded gun when the other guy's got two loaded

---

[81]   *Love v. State*, 457 P.2d 622, 634 (Alaska 1969). Sanders argues that, given the constitutional nature of his claim of error, the State is required to demonstrate that the error was harmless beyond a reasonable doubt. *See, e.g.*, *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011) ("A constitutional violation will always affect substantial rights and will be prejudicial unless the State proves that it was harmless beyond a reasonable doubt. An error that is not constitutional in nature will be prejudicial if the defendant proves that there is a reasonable probability that it affected the outcome of the proceeding."). Because we find that the error was not harmless under the less-demanding standard for non-constitutional errors, we need not determine whether the error was harmless beyond a reasonable doubt.

guns right there on the bed? That makes no sense." The prosecutor also told the jury that "[w]e know intuitively" that Sanders told the other witnesses to the events that "[t]he story will be he hit me first." And the prosecutor told the jury that Sanders had "a motive to lie to the detectives to make himself look good and to leave out the parts of the story that make it look like . . . the shooting of Mr. Moore had a lot more to do with preexisting animosity than we discovered in this case."

In light of the extensive argument against Sanders's account that the State presented during closing argument, we cannot fairly conclude that the exclusion did not have an appreciable effect on the jury's verdict.

## V.    CONCLUSION

Because the excluded evidence should have been admitted and because its exclusion was not harmless, we REVERSE Sanders's convictions and REMAND for a new trial.

BOLGER, Justice, with whom STOWERS, Justice, joins, dissenting in part.

## I.  INTRODUCTION

I agree with the general legal framework the court uses to decide this case. I am troubled, however, by the court's conclusion that Carmela Bacod's statement to Detective Huelskoetter was so trustworthy that the superior court was *required* as a matter of law to admit it under Alaska Evidence Rule 804(b)(5).[1]  Even considering corroborating evidence, I would hold that Bacod's statement does not evince the "circumstantial guarantees of trustworthiness" required for admission under Rule 804(b)(5), and I would affirm the superior court's evidentiary ruling.  In the alternative, I would remand to allow the superior court to exercise its discretion in making this determination under this court's newly announced standard.[2]

## II.  DISCUSSION

The court adopts nine "[p]articularly significant relevant factors"[3] for determining whether a proffered hearsay statement, despite failing to meet any of the enumerated hearsay exceptions, is nevertheless sufficiently trustworthy to be admitted into evidence.[4]  The court concludes that "at least five" of these factors favor the

---

[1]    Op. at 28, 39.

[2]    *See Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 568 (Alaska 2015) ("We . . . review the superior court's application of the evidence rules . . . for abuse of discretion.").

[3]    *See* Op. at 32.

[4]    The court adopts eight of these factors from 2 GEORGE E. DIX ET AL., MCCORMICK ON EVIDENCE § 324, at 565-66 (Kenneth S. Broun ed., 7th ed. 2013) and analyzes evidence of corroboration as a final, standalone factor.  *See* Op. at 32-38.

statement's admission.[5] But for the reasons discussed below, I am not persuaded by the court's analysis, and I would conclude that, on the record before us, only one of these nine factors — the recording of the statement — unambiguously favors admission, while the remaining eight either cut against the statement's trustworthiness or provide little insight into the trustworthiness of the statement.

## A.  Motivation To Speak Truthfully

The court concludes that "Bacod's statement provides no reason to believe she was speaking insincerely *in an effort to help [Ryan] Sanders*."[6] But while I agree that Bacod had no reason to lie *for Sanders*, Bacod's broader motivations for speaking with Detective Huelskoetter remain unknown.  If anything, Bacod's statement suggests that Bacod contacted Detective Huelskoetter partly to determine what the police knew about the shooting,[7] and it is undisputable that she changed her account in real time in response to what she learned.[8]  This casts some doubt on the idea that Bacod called Detective Huelskoetter for the civic-minded purpose of providing a truthful statement to help the police with their investigation.  I would therefore conclude that this factor weighs neither for nor against finding Bacod's statement sufficiently trustworthy.

---

[5]    Op. at 33.

[6]    Op. at 34 (emphasis added).

[7]    Specifically, Bacod asked Detective Huelskoetter:

- "[W]ere you there at the scene?"

- "Was . . . it just [Richards] and [Moore] alone?"

- "[W]as there other people with [Moore] and . . . [Richards]? . . . Were there two females there?"

[8]    Bacod initially indicated that Travis Moore, Ashlee Richards, Raven Ketzler, and Sherrell Porterfield wanted to "jump" and "beat . . . up" Sanders, but she later said "[t]hey were . . . gonna try to talk . . . it out."

**B.	Spontaneity**

In discussing spontaneity, the court focuses primarily on the fact that Bacod initiated the call to Detective Huelskoetter and states that the detective's questions to her were "open-ended."[9]  But though it is true that much of Bacod's statement was made in response to open-ended questions, the most relevant portion — Bacod's claims about Travis Moore's intent[10] — was obtained through the detective's leading questions. Bacod never independently stated (or even implied) that Moore was the ringleader of the alleged assault.  She indicated this only by affirmatively answering two very leading questions:  (1) "So . . . you know that [Moore] wanted to beat [Sanders] up over the money?" and (2) "[W]hen they were goin' over there[,] [it] was pretty much the idea . . . that [Moore] was gonna beat him up?"[11]  I do not think that Bacod's responses to the detective's leading questions on this critical issue can be considered spontaneous, and I would conclude that this factor weighs against the trustworthiness of Bacod's statement.

**C.	Under Oath**

Bacod's statement was not sworn testimony.  Accordingly I would conclude that this factor weighs against the statement's trustworthiness.

**D.	Cross-examination**

Bacod's statement was not subjected to thorough cross-examination. Although Detective Huelskoetter asked several leading questions, none was particularly

---

[9]	Op. at 34.

[10]	Moore's intent was important and perhaps critical to the admissibility of Bacod's statement, as the court notes.  Op. at 18-19.

[11]	Moreover, this second question would have been objectionable if it had been asked at trial because Bacod had no personal knowledge of Moore's state of mind at the moment "when [the alleged conspirators] were goin[g]" to Sanders's apartment.

pointed or intended to cast doubt on Bacod's truthfulness, as the State's questions would have been had Bacod been able to testify at trial. Indeed, cross-examination would have been particularly helpful in clarifying this particular statement, because it might have shed light on whether Richards actually told Bacod that the alleged conspirators were planning to "jump" and "beat . . . up" Sanders or merely indicated an intent to "talk" with him. Because the State was unable to press Bacod on this point, I would conclude that this factor weighs against the trustworthiness of Bacod's statement.

### E.    Relationship

The court concludes that Bacod's decision to talk to a police officer investigating the deaths of two friends strongly favors the trustworthiness of Bacod's statement.[12] The court also notes that knowingly providing false information to the police could have subjected Bacod to criminal liability.[13] And elsewhere in its analysis, the court suggests that Bacod's statement was more trustworthy because she made it in the presence of her mother.[14] But as a general matter, I suspect police officers and parents of teenagers would be skeptical of the court's reasoning, since it is not uncommon for individuals to lie to the police, or teenagers to their parents. And as noted above, the idea that Bacod was highly motivated to tell the truth — either by the death of her friends or by the potential for criminal liability — is somewhat belied by the fact that she changed her account halfway through her statement.

For these reasons, I would conclude that the relationship between Bacod and Detective Huelskoetter provides, at best, weak support for trustworthiness. I do not think there is enough information in the record about Bacod's relationship with her

---

[12]    Op. at 36.

[13]    Op. at 36.

[14]    Op. at 34.

mother and with Detective Huelskoetter (or police officers in general) to support the conclusion that these relationships "strongly favor" her statement's trustworthiness.

## F.      Recantation Or Reaffirmation

There is no evidence to suggest Bacod recanted or reaffirmed her statement *after* talking with Detective Huelskoetter, and she died before the evidence of her statement came to light. As already noted, however, Bacod walked back a critical part of her account — namely, that Moore, Richards, Ketzler, and Porterfield intended to assault Sanders — midway through her statement. Although it seems likely that Bacod's reason for changing her narrative was to protect Ketzler and Porterfield once she learned they had been present at Sanders's house during the shootings, Bacod's shift of narrative was indisputably a "partial[] backtrack,"[15] as the court puts it, or a partial recantation, as I would put it. For this reason, I would conclude that this factor weighs against finding Bacod's statement trustworthy.

## G.      Recording

Bacod's statement was recorded. As the court correctly concludes,[16] this weighs in favor of the statement's trustworthiness.

## H.      Firsthand Knowledge

The court notes that Bacod had firsthand knowledge of her conversation with Richards, which seems indisputable.[17] Nevertheless, I am not persuaded that this factor favors admissibility. It is difficult to imagine proffered evidence of hearsay within

---

[15]    *See* Op. at 16.

[16]    *See* Op. at 33.

[17]    *See* Op. at 37. The court also notes that Bacod had close ties with Richards and knew the identities of the other three alleged conspirators. *Id.* For the reasons discussed in the next section, however, I am unpersuaded that this corroborating evidence supports the trustworthiness of Bacod's statement.

hearsay where the out-of-court declarant will not have firsthand knowledge of the second declarant's statement, so this factor would appear to support the admission of hearsay within hearsay in most cases. But each level of hearsay compounds the risk that the original statement was miscommunicated or misunderstood, and a factor that usually or always favors the admission of hearsay within hearsay seems an unreliable indicator of whether the statement is trustworthy. Therefore, while firsthand knowledge (or lack thereof) seems a particularly relevant factor in determining whether a typical hearsay statement should be considered reliable,[18] I would conclude that this factor has little or no weight in determining the trustworthiness of hearsay-within-hearsay statements, including Bacod's.

## I.       Corroborating Evidence

Finally, the court concludes that corroborating evidence supports the trustworthiness of Bacod's statement. The court highlights Bacod's identification of Moore, Richards, Ketzler, and Porterfield early in her statement without prompting from Detective Huelskotter.[19] And the court notes that the four friends had three weapons in their possession the night of the shootings: (1) Richards's push knife, (2) the machete in the car, and (3) Moore's unloaded pistol.[20]

But the fact that Bacod could identify the alleged conspirators provides minimal corroboration for Bacod's statement, since Bacod's statement suggests that the friends regularly spent time together, and Bacod did not actually know whether Ketzler

---

[18]     *See United States v. Hall*, 165 F.3d 1095, 1111 (7th Cir. 1999) (holding third-party suspect's confession unreliable where it was "clear" that suspect "knew nothing about the specifics of the crime").

[19]     Op. at 36.

[20]     *Id*. at 37.

and Porterfield visited Sanders the night of the shootings. Moreover, Bacod's identification of her friends does not corroborate the critical portion of Bacod's statement: her explanation for why those friends visited Sanders's apartment.

Likewise, the existence of the three weapons adds little corroborative force to Bacod's statement. The push knife and machete are conditionally relevant only if the weapons were intended to be used to assault Sanders,[21] but there is no evidence of such intent. To the contrary, Richards never brandished the push knife and the machete remained in the car.[22] And while Moore's pistol provides some corroboration for the general thrust of Bacod's statement, the weapon's existence *rebuts* the portion of Bacod's statement that specifically addresses Moore's relationship with firearms. When asked whether she had ever observed Moore with a gun, Bacod responded: "No, . . . no. I can't imagine [Moore] with a gun."[23] Bacod further speculated that *Ketzler* was the only one of the alleged conspirators who might have had a gun, but there is no evidence in the record suggesting that Ketzler possessed a firearm either on the night of the shootings or in general.

For these reasons, I do not share the court's confidence that Bacod's identification of the group of friends who visited Sanders on the night of the shootings — or the existence of the friends' three weapons — significantly corroborates Bacod's statement. I would conclude that the corroborating evidence here provides only weak support for the statement's trustworthiness.

---

[21]     *See* Alaska R. Evid. 104(b).

[22]     Indeed, Sanders was not aware of either weapon, and the superior court concluded they were irrelevant and inadmissible.

[23]     It also seems odd that Moore would take an *unloaded* weapon to Sanders's house if he *intended* to assault Sanders.

## III.   CONCLUSION

I disagree with the court's conclusion that Bacod's statement was sufficiently trustworthy to be admissible under Rule 804(b)(5), and I am especially troubled by the court's holding that Bacod's statement was so trustworthy that it *must* be admitted as a matter of law.[24]

The court attempts to narrow the breadth of this holding by stating that the residual hearsay exceptions apply "only on rare occasions," should not be treated as "invitations to discard the general prohibition on the admission of hearsay," and must be applied on a "case-by-case" basis.[25]  But litigants — both criminal and civil — will no doubt cite *this case* to support the admission of hearsay statements under the residual hearsay exceptions.  And Bacod's unsworn, telephonic statement seems less trustworthy than evidence from sworn affidavits or in-person interviews if such evidence can be partially corroborated.  Though the court has not previously held that these types of hearsay evidence should be admissible at trial, I fail to see why today's ruling will not lead to the regular admission of such statements.

I fear the court will come to regret its expansion of the residual hearsay exceptions, and I respectfully dissent.

---

[24]   *See* Op. at 39.

[25]   *See* Op. at 32-33.

**Q - DETECTIVE M. HUELSKOETTER**
**A - CARMELA BACOD**

A.　Everything happened, and she told me, like, actually it's been goin' on for like, about two weeks now.　Um, the - Ryan SANDERS (Phonetic), he stole money from one of our friends, and they wanted to go beat him up to get the money back, 'cause it was pretty much a lot of money, and I think that's what like, triggered it (clears throat) to happen.

Q.　Do you know who, uh - which friend had the money stolen?

A.　I don't know her last name.　I've met her just one time.　Her name is RAVEN (Phonetic), though.

Q.　Okay.　So, what - what exactly do you know about the s - stealing of the money?

A.　Um, well, ASHLEE (Phonetic) told me, uh, like about a week and a half ago, she told me on the phone that hi - her, RAVEN, and TRAVIS (Phonetic), and TRAVIS's fiancée SHERRELL, (Phonetic) and RYAN were all hangin' out, and then RYAN ended up the one only awake.　Everyone was sleeping and they woke up with money gone, and they were guessing it was him, 'cause he was the only one awake, and he was gone when they came - when they woke up.

Q.　Humph.

A.　So, they assumed that he had stolen the money and ASHLEE told me that she heard around that RYAN had bought, uh, marijuana and alcohol and other drugs with the money.

Q.　Uh-huh.

BACKGROUND NOISE

A.　So, that's what I've heard.

BACKGROUND NOISE

Q.　Okay.　Do you - do you know of any other, uh, bad blood between RYAN and TRAVIS and that group?　Any other things goin' on?

BACKGROUND NOISE

A.　Um, I don't know RYAN - I've never met RYAN, but his name sounds really familiar, and I've known TRAVIS for a couple months, and I've known ASHLEE, she - she was my best friend, and I've known her since third grade.

Q.　Okay.

A.　But, that was pretty much what she told me.

Q.　So, what did . . .

A.    She . . .

Q.    . . . they tell you about, uh, wanting to go, uh, beat them up over this?  I mean, what specifically do you know about that?  What was the plan?

BACKGROUND NOISE

A.    (Clears throat) Um, actually he had - he wanted to hang out with them . . .

Q.    He, as in TRAVIS?

A.    Uh, RYAN.  He wanted to hang out with all of us.  I was supposed to go with them to their house . . .

Q.    Oh, okay.

A.    . . . that night. (Clears throat) Um, I really don't know, like - oh, I can't think right now.

Q.    Okay.

A.    Sorry.

Q.    So - but you know that TRAVIS wanted to beat RYAN up over the money?

BACKGROUND NOISE

A.    Yeah.

BACKGROUND NOISE

Q.    And that when they were goin' over there that was pretty much the idea, is that TRAVIS was gonna beat him up?

BACKGROUND NOISE

A.    Yeah.  Um, were you there at the scene?

Q.    I've - I was at the scene.

BACKGROUND NOISE

A.    Was, uh - was it just ASHLEE and TRAVIS alone?

Q.    I - I'm sorry?

A.    Like, um, was there other people with TRAVIS and SHERRELL, like - I mean, ASHLEE?

Q.    Yeah.  There were.

A.    Were there two females there?

Q.    Yes.

BACKGROUND NOISE

Q.    So, do you know somethin' about that?

A.    Well, um, RAVEN, she's a Native.  I don't know if that was one of her females, but, she had long hair . . .

Q.    'Kay.

A.    . . . that's RAVEN.  SHERRELL's a Black female.

Q.    Uh-huh.

A.    She was, uh, TRAVIS's fiancée.

Q.    Okay.

BACKGROUND NOISE

A.    Um, ASHLEE just told me that they wanted the money back, and then they were gonna jump 'em for it.  But, uh, she told me that earlier they tried before or something like that, and RYAN's brother got mad or something and pulled a gun on RAVEN's face, or something like that.  I don't know.  She didn't tell me much about that.

Q.    So, uh, [your] name's CARMELA, is that right?

BACKGROUND NOISE

A.    Yes.

BACKGROUND NOISE

Q.    So, now, just let me see if I understand correctly, that you knew that kinda the plan was that TRAVIS and his girlfriend and ASHLEE and - and some other girl named RAVEN were gonna go over there and essentially jump them to get their money back?

A.    Not - not jump, like, you know, like, talk.

Q.    Okay.  They were . . .

A.    But . . .

Q.    . . . gonna try to talk . . .

A.    . . . obviously . . .

Q.    . . . it out, or . . .

A.    . . . they're young, so, you know, there's gonna be violence in it.

Q.    Okay.

A.    But, I couldn't stop them.

Q.    Right.  So, they - they - I mean basically the only reason they were going over there was to get the money back.

BACKGROUND NOISE

A.    Probably.

Q.    Okay. Alright.

BACKGROUND NOISE

Q.    Um, you ever see TRAVIS with a gun?

BACKGROUND NOISE

A.    No, he - no.  I can't imagine TRAVIS with a gun.

Q.    You can't imagine TRAVIS with a gun?

A.    No.  He's so nice.

Q.    Is he?

BACKGROUND NOISE

Q.    (Sighs) Um, who on that side would - would have had a gun?

BACKGROUND NOISE

A. Definitely not ASHLEE.

Q. Okay.

BACKGROUND NOISE

Q. Anyone else that you can think of that mighta had a gun?

BACKGROUND NOISE

A. I can't really, like - I don't know RAVEN that much, but probably she could. I've only met her once.

Q. Okay.

A. And I don't know her.

BACKGROUND NOISE

Q. Okay. I - is there anything else that, uh . . .

BACKGROUND NOISE

Q. . . . you think I should know?

BACKGROUND NOISE

A. That's - I told you everything I know.

Q. Okay. CARMELA, what's your last name?

BACKGROUND NOISE

A. BACOD.

Q. Can you spell . . .

A. B . . .

Q. . . . that?

A. B as in boy . . .

Q. Uh-huh.

A. . . . A-C-O-D as in dog.

Q. B-A-C-O-D?

BACKGROUND NOISE

Q. BACOD?

A. Yeah.

Q. What's your date of birth?

A. [Bacod provided her date of birth]

BACKGROUND NOISE

Q. Um, and how do I get a hold of you again, just call this number?

BACKGROUND NOISE

A. This is my mom's cell phone.

Q. Okay. You have your own cell phone, then?

A. Yeah.

Q.     Okay.  And, uh, is that, uh, [Detective Huelskoetter recited Bacod's phone number]?

BACKGROUND NOISE

A.     Yeah.

Q.     Okay.

BACKGROUND NOISE

Q.     And where do ya live?

BACKGROUND NOISE

A.     Um, [Bacod provided her home address] . . .

       . . . .

Q.     . . . Alright.  If, uh, if I have any other questions, can I, uh, give you a call back or come see you?

BACKGROUND NOISE

A.     Yeah.

Q.     Okay.  And, uh, do you have somethin' to write my name and number down with?

BACKGROUND NOISE

A.     Mom, can I get a pen?

Q.     'Cause I'll give you my direct number.

BACKGROUND NOISE

A.     Okay.

Q.     Okay, my first name is MARK.

BACKGROUND NOISE

Q.     My last name, I'll spell it for you, 'cause it's really long.  It's spelled H-U-E-L-S-K-O-E-T-T-E-R.

BACKGROUND NOISE

Q.     And my telephone number is [Detective Huelskoetter provided his phone number]

BACKGROUND NOISE

A.     Okay.

Q.     Okay?

A.     Thank you.

Q.     So, if you think of anything that - that I should know about, will you please give me a call?

A.     Yes.

Q.     Alright, well thank you very much.

A.     You're welcome.

Q.     We'll talk to you later.

A.    Alright.
Q.    'Bye.
A.    'Bye.
BACKGROUND NOISE
RECORDER SHUTS OFF
**END OF PHONE CONTACT**